UNITED STATES of America,
Appellee,

v.

Roy HARMAN, Appellant.

No. 9723.

United States Court of Appeals
Fourth Circuit.

Argued June 1, 1965.

Decided July 23, 1965.

LeRoy Katz (Court-assigned counsel), Bluefield, W. Va., for appellant.

Jay M. Vogelson, Sp. Asst. to the U. S. Atty. (George D. Beter, Acting U. S. Atty., on brief), for appellee.

Before SOBELOFF and BRYAN, Circuit Judges, and BARKSDALE, District Judge.

BARKSDALE, District Judge:

At the July, 1961, Term of the United States District Court for the Southern District of West Virginia, sitting at Beckley, an indictment was returned against defendant Roy Harman and David Robert Stevenson, and the case was set for trial at Bluefield. The indictment was in three counts, and charged the defendants (1) with unlawful distilling, (2) with making and fermenting a quantity of mash, and (3) with unlawful possession of four gallons of distilled spirits, on June 21, 1961, in violation of 26 U.S.C.A. §§ 5601(a) (4), 5601(a) (7), and 5604 (a) (1). Stevenson died before being brought to trial and the case proceeded against Roy Harman. Harman was first tried by the court with a jury on November 27, 1963, the trial resulting in the conviction of Harman and the imposition of concurrent sentences of four years on each count. However, on appeal, this conviction was reversed for errors in the court's charge, "in part expressly, and in part tacitly, admitted by the United States. These consisted in failing to instruct the jury as to the law applicable to the respective counts, and in instructing the jury as to an inapplicable presumption", and the case was remanded to the District Court for a new trial. United States v. Harman, 4 Cir., 323 F.2d 650. The case again came on for trial with a jury before a different judge on October 8, 1964, and again resulted in the conviction of the defendant on all counts and the imposition of concurrent sentences of five years on each count. The defendant, by counsel, moved for a judgment of acquittal at the conclusion of the Government's evidence, again at the conclusion of all evidence, and after the jury had returned its verdict, defendant again moved for a judgment of acquittal, or in the alternative, for a new trial. All these motions having been overruled by the court, defendant has prosecuted this appeal.

Briefly stated, the facts are that in June of 1961, Roy Harman and his wife were living in a rural area of McDowell County, West Virginia, where they were engaged in farming and raising livestock on a small tract of land. Having discovered a still located in the vicinity of the Harman home, Investigators Bodine, Waldron and West of the Federal Alcohol and Tobacco Tax Division, on June 21, 1961, raided the still. When they had reached a point in the woods approximately one hundred yards from the still, Bodine undertook to observe what was going on at the still through what he called "highpowered binoculars". He observed that the still was in operation and that there were three men present, none of whom could he recognize or identify at that distance. Thereupon, the three investigators separated, in order to surround the still site. Bodine proceeded directly to the still, where he found Stevenson sitting on a rock, and another man doing something at the cooler barrel whom he said he immediately recognized as Roy Harman when he turned around. Bodine said: "Roy, how about a drink?" Whereupon, after looking at Bodine very quickly, the man alleged to be Roy Harman broke and started to run. Bodine undertook to apprehend him, a scuffle ensued, and the alleged Roy Harman escaped and was not apprehended until more than a year later. Bodine only saw him for a matter of seconds. He admitted that he had only seen him three times before, the first time several years before the raid, and the other times, two or three weeks before the raid, on the street in War, West Virginia. Bodine testified that the alleged Harman was wearing a cap something like an army fatigue cap. Such a cap was found in the vicinity of the scuffle, and the investigators took it with them along with certain other evidence after the still had been destroyed. However, the cap was not produced at the trial, nor was there any evidence in explanation of its nonproduction. Harman's wife testified that he never wore any kind of cap and did not own one.

After raiding the still, the three investigators went to Roy Harman's house, Roy was not there, but his wife, along with her mother in law and her sister's daughter, was there, as well as one Frank

Altizer. Believing that Altizer was the third man at the still, the officers arrested him and took him before the United States Commissioner at Beckley for a preliminary hearing the following day, June 22, 1961. Upon the testimony of Bodine, the Commissioner held Altizer for the grand jury and committed him to jail. However, he was shortly released, has never been brought to trial, nor has he ever been indicted. At Roy Harman's trial, besides Bodine, Altizer was the only other witness for the Government who connected Roy Harman with the still. Consequently, his situation merits some attention.

■ Altizer, as a Government witness, testified that Roy Harman owned and operated the still, that he, Altizer, had been to the still on a number of occasions to get whiskey for himself, and that on the morning of June 21st, Harman left his house with a bag over his shoulder headed in the direction of the still. On the day of the raid, Altizer signed a statement prepared for his signature by Investigator West, admitting that he had helped Harman carry out whiskey from the still two or three different times. However, he denied this when he testified at the trial. Altizer admitted that, although he was fifty-six years old, he had no real occupation, nor had he ever done any work of consequence. He denied having anything to do with making whiskey, but admitted that he had been in jail many times for being drunk, maybe as many as a hundred times. The fact that, upon the evidence of Bodine, the Government's principal witness against Roy Harman, Altizer, was held for grand jury action by the Commissioner, but never brought to trial, nor indicted, with no explanation of why his prosecution was abandoned, certainly makes his testimony suspect, to say the least. This situation, coupled with Altizer's habitual drunkenness and general worthlessness, renders his testimony, in corroboration of Agent Bodine, of little, if any, value.

During the trial, over the objection of the defendant, Investigator Bodine was permitted to introduce in evidence two head-and-shoulder pictures of the defendant, one full face and the other a profile. Not only did defendant's counsel object to the introduction of these pictures when Bodine was asked by Government counsel to produce them, but before the trial commenced, defendant's counsel made a motion that the court not permit the introduction of these pictures, "because they are of the type of pictures that are taken of a convicted felon, and this would indicate to the jury when they see these pictures, that he has a previous conviction, and until such time as he would take the stand it would not be admissible evidence, and the inference is so strong from those pictures, that we move that they not be admitted," Roy Harman did not take the witness stand in his own defense, nor did he in any way put his character in issue. The pictures show the defendant in a work shirt, wearing a black tie, and across the bottom of the full face picture the following appears:

"USPA        74040        11 5 53"

As to the pictures, Bodine testified as follows:

"Q. And in the course of your duties as an investigator—special investigator for the Alcohol and Tobacco Tax Unit, did you have occasion to have in your possession during your special assignment any picture resembling Roy Harman?

"A. Yes, sir, I had a picture in my folder which I carried in my brief case on assignment for which I had concerning the activities of Roy Harman, which was a picture taken—oh—several years prior to this."

Defendant's objection to this evidence was overruled.

"Q. And is this rather usual or unusual that an investigator should carry with him the picture of a person?

"A. It is the usual procedure when there is a special assignment made for an officer to have a picture of the principal in the investigation.

"Q. And you were sent here as a special agent, on a special assignment, is that correct?

"A. Yes, sir, that is correct.

"Q. And what was the purpose of the special assignment?"

To this question, defendant's objection was overruled.

"A. The purpose of that assignment was to perfect a case against Roy Harman relating to the violation of the Internal Liquor Laws."

## DISCUSSION

On this appeal, defendant's counsel in his brief and argument raised the following questions:

"1. Whether the trial court erred in permitting the introduction of the pictures of the defendant * * *, which pictures were taken while defendant was an inmate at the United States Penitentiary at Atlanta, Georgia, and which pictures showed thereon his prison number and other information?

"2. Whether there was sufficient evidence to support the verdict of guilty rendered by the jury?

"3. Whether the trial court erred in not instructing the jury, at the request of the defendant, that mere presence at the still site was not sufficient to prove possession?

"4. Whether the court erred in not dismissing the indictment because it was returned in a division other than that in which the alleged crime occurred?"

■■ We find no merit in defendant's contentions as to questions 2 and 3. The Government's case was not a strong one, depending almost entirely on Bodine's identification of the defendant. Neither of the other two investigators undertook to identify him. Bodine had never had any conversation with Harman; had never even spoken to him. He admitted that he had only seen him three times before, the first time several years before, and then only casually. However, he did undertake to positively identify him, and this was enough to take the case to the jury. Nor did the court err in not charging the jury specifically that "mere presence at the still site was not sufficient to prove possession". There was evidence of more than "mere presence" on the part of the man alleged to have been Harman. On the whole, the court fully and fairly charged the jury as to the applicable law.

■ As to question No. 4, although he frankly concedes that he has been unable to find any law to support defendant's contention, at defendant's request his counsel has raised the question whether the indictment should have been dismissed because it was returned in a division other than that in which the alleged crime occurred. It is true that Rule 18 F.R. Crim.P., so far as pertinent, provides:

"* * * the prosecution shall be had in a district in which the offense was committed, but if the district consists of two or more divisions the trial shall be had in a division in which the offense was committed."

However, the statute which divides West Virginia into two judicial districts, Northern and Southern, does not divide the districts into divisions, but merely specifies the places where court shall be held. 28 U.S.C.A. § 129. Under these circumstances, the fact that the indictment in this case was returned at Beckley and the case was tried at Bluefield, was entirely proper. Dobie on Federal Procedure 515, United States v. Sutherland, D.C., 214 F. 320, Patrick &c. v. Globe &c. Ins. Co., D.C., 21 F.2d 106, and Salinger v. Loisel, 265 U.S. 224, 44 S.Ct. 519, 68 L.Ed. 981.

However, the introduction of Harman's pictures (Defendant's question No. 1) raises a much more serious question.

It is to be noted that Investigator Bodine made no explanation of how he came into possession of these pictures, where, when, or by whom they were taken, other than to say that they were taken "several years prior to this", and that it was usual procedure for an investigator on special assignment "to have a picture of the principal in the investigation", and that

his assignment "was to perfect a case against Roy Harman * * *." When they were admitted during the trial, over the objection of the defendant, they were shown to the jurors, and they were sent to the jury room with the jurors when they retired to consider of their verdict. After the buildup given Harman by Bodine's testimony that Harman was the principal in the special investigation which he had been assigned to make, and that the purpose of this assignment "was to perfect a case against Roy Harman", the pictures and the inferences to be drawn from them of necessity must have been of peculiar interest to the jurors during their lengthy consideration of the case. It is a matter of common knowledge that on the walls of all Post Offices there are pictures of wanted criminals, and almost all these pictures are of the same type, and very similar to, the pictures here in question. In would seem that the inscription on one of the pictures shows that it was taken at the United States Prison at Atlanta, gives the prisoner's number and the date on which the picture was taken. It is doubtful that the inscription on the picture conveyed all this information to the jury. However, the conclusion seems inescapable that the pictures, taken together with Bodine's testimony, must have conveyed to the jury the information that Harman had been previously convicted and had served a prison sentence.

■■ Of course, there are many instances where pictures of persons, places and things are clearly admissible in evidence, and sometimes quite helpful. However, this is not one of those instances. Since Harman did not testify or put his character in issue, of course, any evidence of a previous conviction would have been inadmissible. This case does not come within any exception to this general rule. Particularly in whiskey cases, evidence of previous convictions is highly detrimental to a defendant's chances of acquittal. This is especially true when the defendant does not testify. In this case, as to defendant's failure to

testify, the District Judge charged the jury fully and fairly. It is doubtful that anything the judge might have said could have removed the prejudice created by the introduction of these pictures, but in his charge, the District Judge did not mention them at all. It is our conclusion that the introduction of these pictures in evidence was error, constituted serious prejudice to the cause of the defendant, and thus deprived him of a fair trial.

We find that the authorities relied upon by the Government neither compel nor suggest a conclusion contrary to that which we have reached. The Government places considerable reliance on Bynum v. United States (D.C.Cir.), 107 U.S.App.D. C. 109, 274 F.2d 767. This case went to the Court of Appeals twice, the first opinion being reported in 104 U.S.App.D.C. 368, 262 F.2d 465. On that appeal, defendant's conviction was reversed and the case remanded for a new trial by reason of the admission of a finger print of Bynum obtained as a product of his unlawful arrest. Bynum v. United States, 262 F.2d 465. On the second appeal, the court in its per curiam opinion, said:

> "On the trial now under review the fingerprint so obtained was not used; instead, an older fingerprint in the files of the Federal Bureau of Investigation, in no way connected with the unlawful arrest, was used for purposes of comparison."

It does not appear from the opinion that the finger print used in the second trial showed any previous conviction of the defendant, or even that defendant was in custody when the finger print was taken. Nor does it appear that defendant, in the second trial, interposed any objection to the introduction of the finger print from the files of the F.B.I., nor that it was even suggested that this finger print indicated a previous conviction.

In another case cited by defendant in his brief, Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090, the photograph in question was not a picture of the defendant, but a picture of the murdered man. In the case of United

States v. Amorosa (3d Cir.), 167 F.2d 596, also cited in the Government's brief, a picture of defendant Amorosa, made after he had been taken into custody, bore an F.B.I. serial number on it. This and another picture were introduced into evidence without objection on the part of the defendant. Nevertheless,

> "The trial judge in his charge instructed the jury as to the F.B.I. number on the picture, 'You are not to infer because of that number that the defendant is guilty of this crime or of any other crime. In other words, you are to predicate no finding of fact on the mere fact that on the front of the picture there appears this F.B.I. number. You will, for the purposes of this case, completely disregard the fact that one of the pictures bears a number.' The pictures were offered by the government as representative of Amorosa's appearance at the time he was arrested on the questions of his flight and his efforts to conceal his identity.

> " \* \* \*

> "Though the picture bearing the F.B.I. number went into evidence without objection the court of its own motion, as above quoted, disposed of any stigma that might attach to it."

In the recent case of United States v. Dillinger (4th Cir.), 341 F.2d 696, it appeared that at the trial the F.B.I. agent who arrested defendant testified as to statements made by him immediately after the arrest. He testified that Dillinger told him that his friend, Fry, whom he had met in the Atlanta Penitentiary, came to Dayton, Ohio, after which the two set about the journey which resulted in this prosecution. This court said:

> "There was no objection at the time to the reference to the Atlanta penitentiary, but appellate counsel now suggests that we ought to notice the court's disregard of it as plain error. We think not.

> "The reference to the Atlanta penitentiary was of such a passing nature, and so apparently inadvertent, that it ought not to occasion the necessity of a new trial. Nothing else occurred in the trial to call attention to the reference or to highlight it in any way. It was the kind of thing that more than likely went unnoticed by the jury as it did by the court.

> "It has frequently been held that a new trial was not required by similar statements by a witness so long as they appeared to have been incidental and inadvertent. Indeed, in Means v. United States, 62 App.D.C. 118, 65 F.2d 206, the Court dealt with almost the precise reference, the witness quoting the defendant as referring to a man whom he had met in the Atlanta penitentiary."

The situation in the instant case was entirely different. There was vigorous objection, both before and during the trial, to the introduction of Harman's pictures. Their introduction was by no means casual or inadvertent: their introduction was deliberately planned and insisted upon by Government's counsel.

It seems to us that there is ample authority supporting the conclusion which we have reached. In Hatchet v. United States, 54 App.D.C. 43, 293 F. 1010, it was held that, where, in a prosecution for larceny, defendant did not testify, and there was no issue as to his identity, admission of evidence that his picture was in the "rogues gallery" in connection with another arrest under a different name, for a similar offense, was error requiring reversal.

In the recent case of Tallo v. United States (1st Cir.1965), 344 F.2d 467, it appears that in the trial defendant's mother-in-law was asked where defendant's wife lived before she came to live with her, and answered:

> "Well, first she lived by herself. I furnished her a four-room house while Mr. Tallo was in jail."

Defendant's counsel immediately moved that this testimony be stricken and for a mistrial. These motions were overruled, and the trial resulted in the convic-

tion of the defendant. In reversing the conviction, the court said:

"Where, as in this case, the defendant elected not to take the stand, the reference to his having been in jail, standing alone and unexplained, could only be prejudicial. On the record of this case, 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'"

The court commented on the case of United States v. Stromberg (2d Cir.), 268 F.2d 256, in which a witness blurted out a nonresponsive answer to the effect that the defendant had been in jail. The trial judge immediately struck out the testimony and instructed the jury to pay no attention to that remark in any way, to disregard it completely. The Court of Appeals for the Second Circuit held that the prompt instruction to disregard the answer cured the error.

The court then went on to say:

"While we are not prepared to rule that defendant's motion for mistrial should have been granted, nor that a corrective instruction on the spot would have been inadequate to cure any harm caused by the non-responsive answer, the conviction herein must be set aside and a new trial granted, both because the objectionable portion of the answer was not stricken and because the record indicates that no curative instruction was given immediately after the incident nor at any later stage in the trial."

In 20 Am. Jur. 608, the general rule is stated as follows:

"Photographs are admissible in evidence in criminal cases upon the same principles and rules governing their admission in civil cases. However, photographs taken from the 'rogues gallery' collection of photographs, or the files of photographs taken in prison, are generally inadmissible when on their face they are identifiable as such pictures."

In a note to State of Oregon v. Weston, 155 Or. 556, 64 P.2d 536, 108 A.L.R. 1402,

at page 1425, there appears the following:

"Generally, a photograph of the accused is not admissible in evidence as proof of identity where it is evident upon its face that it is a 'rogues gallery' photograph, or a photograph taken in prison."

A number of cases are cited, among which is the English case of Rex v. Dwyer, 2 K.B. 799, 14 B.R.C. 463. In a prosecution for breaking and entering, photographs of the defendants wearing prison numbers were produced for the inspection of the jury, the issue being the identification of the defendants. The Court held that such photographs were the same as sworn affidavits that the defendants had been previously convicted, and that, therefore, the appeal would be allowed and the defendant's conviction quashed.

From the foregoing, it follows that the judgment of the District Court will be reversed and this action will be remanded for a new trial consistent herewith.

Reversed and remanded.