**UNITED STATES of America,**
**Appellee,**

**v.**

**Charles A. HARRINGTON, Appellant.**

**No. 413, Docket 73–1989.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 9, 1973.

Decided Dec. 28, 1973.

488

Peter Mear, Asst. U. S. Atty., Stewart H. Jones, U. S. Atty., D. Conn., for appellee.

Thomas D. Clifford, New Haven, Conn., for appellant.

Before WATERMAN, FRIENDLY and TIMBERS, Circuit Judges.

WATERMAN, Circuit Judge:

Appellant, together with Thomas Strogoff and Robert B. Endler, was indicted in a single indictment containing three counts. In Count One they were charged with larceny, a violation of 18 U.S.C. § 2113(b); in Count Two with possession of stolen property knowing the property to have been stolen, a violation of 18 U.S.C. § 2113(c); and in Count Three with having conspired to commit the substantive crimes charged.

Appellant was the only one of the three who stood trial, and he chose not to take the stand. The conspiracy count was dismissed as to him by the trial judge, the jury acquitted him on Count One, and he was found guilty on only Count Two.

As we hold that reversible error occurred during appellant's trial we reverse the judgment of conviction which was entered on the jury verdict and remand for a new trial.

The Government charged that on May 12, 1972 appellant Harrington participated with his two companions, Thomas Strogoff and Robert B. Endler, in the theft of approximately $103,000 in checks from a delivery vehicle belonging to the Constitution National Bank at Wethersfield, Connecticut.

The thieves made a successful escape and avoided immediate detection. The first "lead" toward a solution of the crime occurred when a desk clerk at a local hotel discovered two of the delivery bags which had been removed from the truck. Subsequent to the discovery of the bags which had been left on one of the building's fire escapes, the same desk clerk, in inspecting the hotel's air shaft, found torn pieces of the stolen checks there and ascertained that they had been discarded from a room which had been occupied during the period prior to and following the theft by the appellant and Endler, who, though indicted with appellant, pleaded guilty to a substituted information.

A search of belongings left in the room yielded a baggage key. This was the key to a public locker which when opened was found to contain a number of the stolen checks. Harrington's fingerprints appeared on two of the checks.

At trial the Government elicited from several witnesses testimony designed to show that Harrington had been in possession of some of the stolen checks following the commission of the crime. One witness testified that at Harrington's request she had cashed one of the checks for him. A salesman at a stereo equipment store stated that Harrington had purchased a tape recorder with a check which was shown to have been one of those stolen. This testimony, however, was contradicted by testimony of

Endler, who had been called to the stand by the defense. The prosecution also sought at trial to have a government witness, one Mancini, a restaurant owner, identify Harrington as the man who had vouched for Strogoff and Endler when the witness had cashed checks for them. However, when he was asked to make an in-court identification of Harrington, the restaurant owner was unable to do so. The Government attempted to salvage this identification by having the owner duplicate in court a previous out-of-court identification he had made from "mug shot" photographs. After a controversy between counsel, which occurred in full view of the jury, these photographs were admitted into evidence, although before they were ruled admissible the judge in open court ordered their appearance to be somewhat altered.

Upon appeal appellant offers one argument which he claims requires the dismissal of the indictment and, in the alternative, he presents two further contentions arising out of trial occurrences in connection with the prosecutor's handling of the photographs and the use made of them, which he asserts justify a reversal of his conviction and entitle him to a new trial.

Appellant first urges that the indictment upon which he stood trial should be dismissed because the grand jury proceedings were fatally infected by the testimony of Strogoff. Harrington would have us hold that this testimony must be expunged. If this were done he claims there would be insufficient credible admissible evidence before the grand jury to warrant the presentment of an indictment. Indeed, the only remaining testimony would be that of the investigating FBI agent, Brandon, and much of the agent's testimony was hearsay.

Strogoff was a self-confessed participant in the crime. Before the grand jury he implicated appellant Harrington. In his testimony Strogoff acknowledged that he was "addicted to heroin, all kinds of drugs." There was, however, no exploration, or even mention, of any psychological maladies affecting Strogoff. Following this grand jury appearance Strogoff was subjected to several psychiatric examinations, and was eventually adjudged incompetent to stand trial. Without exploring his mental problems to any unwarranted degree, it is fair to say that he was afflicted with serious mental disease, more particularly paranoid schizophrenia.

In support of his contention that the indictment should be dismissed appellant relies on United States v. Estepa, 471 F.2d 1132 (2 Cir. 1972), where an indictment had been returned on the basis of the hearsay testimony of a government agent. Although the agent was one of several government officers who were least familiar with the vital events of the matter upon which testimony was being taken, he gave the grand jury the impression that he was relating his personal first-hand observations of the events he was describing. Furthermore, a number of other government agents were available who could have supplied the non-hearsay first-hand evidence. Prior to our decision in *Estepa* we had issued warnings to prosecutors that the grand jury must be made aware of the hearsay character of the evidence presented to it, so that, if dissatisfied with the initial presentation, it could knowledgeably demand more probative evidence. *Estepa* was thus not intended to modify broadly the rule recognizing the acceptability of hearsay evidence in grand jury proceedings. See Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Rather, it was intended as manifest warning that it is impermissible to have law enforcement officers who have no first-hand knowledge of the subject the grand jury is investigating testify as if they possessed that knowledge.

Appellant would have us extract from *Estepa* a requirement that the prosecution has a broad and amorphous duty to apprise the grand jury of the quality of all evidence presented to it. Whatever the scope of such a duty, if indeed a duty exists, there seems to be no

substantial ground to challenge the prosecutor's presentation here. Assuming, *arguendo,* that knowledge of some of Strogoff's mental problems can be imputed to the Government at the time he testified before the grand jury, Strogoff's own testimony that he was addicted to "all kinds of drugs" was sufficient warning to the grand jurors to suggest to them that they seek from further sources evidence concerning Harrington's involvement in the crime. See United States v. Payton, 363 F.2d 996, 999–1000 (2 Cir.) (Friendly, J., dissenting), cert. denied, 385 U.S. 993, 87 S.Ct. 606, 17 L.Ed.2d 453 (1966).

■ In any event, the indictment is sustainable without dependence upon the testimony of Strogoff. A substantial portion of agent Brandon's testimony was undoubtedly hearsay,[1] yet the testimony was delivered in such a way that the grand jury could not have been deceived into believing that it was hearing a recitation of the agent's first-hand observations. The prosecutor's presentation here is thus totally distinguishable from that in *Estepa.* Inasmuch as the testimony of agent Brandon, exclusive of any other evidence in the case, was sufficient to support the grand jury's return of an indictment, we reject appellant's claim that the indictment should be dismissed.

The first of appellant's two contentions that he is entitled to a new trial because of trial error is that the introduction into evidence of the altered "mug shots" so prejudiced his right to a fair trial that we must now reverse his conviction. Although the issue appellant raises is not susceptible of a simple solution, we hold that, under the totality of the circumstances here, appellant's right to a fair trial was indeed infringed, and, accordingly, we reverse the conviction and order a new trial.

■ An examination of the issue proceeds from the recognition of a basic tenet of our criminal law. If, at his trial, a defendant does not take the witness stand in his own defense, and if he has not himself been responsible for causing the jury to be informed about his previous convictions, he is entitled to have the existence of any prior criminal record concealed from the jury. The defendant's right to this protection is so well understood that discussion of it is unnecessary. However, this protection may be lost by unexpected trial occurrences such as occurred here when the prosecution sought to salvage an identification by confronting its witness with appellant's photographs. That the introduction of photographs of a defendant may well be equivalent to the introduction of direct evidence of a prior criminal conviction has been articulated in a number of recent opinions which have recognized that the introduction of certain photographs may result in getting before the jury the fact that the defendant has a prior record, and so has deprived the defendant of his right to a fair trial. Thus, the Seventh Circuit in United States v. Reed, 376 F.2d 226, 228 (7 Cir. 1967), has explained that such evidence

. . . vitiated his right to be presumed innocent until proven guilty and was prejudicial error. Repeated objections to this testimony were sustained, but the testimony remained. This testimony made the difference between the trial of a man presumptively innocent of any criminal wrongdoing and the trial of a known convict. His right not to take the stand in his own defense was substantially destroyed. His past record could not have been directly shown by the prosecution as part of its case to prove bad character since Reed's character was not in issue. The testimony did this indirectly. (Footnote omitted).

In a similar vein, the Fourth Circuit has stated:

Since Harman did not testify or put his character in issue, of course, any

---

1. As mentioned previously, however, this fact alone does not mandate dismissal of an indictment. See Costello v. United States, supra.

evidence of a previous conviction would have been inadmissible. This case does not come within any exception to this general rule. Particularly in whiskey cases, evidence of previous convictions is highly detrimental to a defendant's chances of acquittal. This is especially true when the defendant does not testify. In this case, as to defendant's failure to testify, the District Judge charged the jury fully and fairly. It is doubtful that anything the judge might have said could have removed the prejudice created by the introduction of these pictures, but in his charge, the District Judge did not mention them at all. It is our conclusion that the introduction of these pictures in evidence was error, constituted serious prejudice to the cause of the defendant, and thus deprived him of a fair trial. United States v. Harman, 349 F.2d 316, 320 (4 Cir. 1965).

This same philosophy has been expressed by the District of Columbia Circuit in the case of Barnes v. United States, 124 U.S.App.D.C. 318, 365 F.2d 509, 510 (1966) (Leventhal, J.) :

> It is well-settled law that the criminal record of a defendant may not be introduced into evidence at trial unless the defendant takes the stand or otherwise places his character in issue. A photograph which on its face reveals the existence of such a criminal record is likewise inadmissible when the defendant's character has not been placed in issue. (Footnote omitted).

At first blush these principles appear uncomplicated and subject to little, if any, qualification. However, our investigation of cases concerning the direct or indirect admission of evidence of prior convictions through the use of "mug shots" for identification purposes reveals that the application of these principles has given the courts extreme difficulty. Presumably, this anguish derives from the real and undeniable importance of the use of "mug shots" by police to assist victims in identifying criminals during initial investigations

and, arguably at least, at the later prosecutorial stages of the criminal process also.

Inasmuch as we do not regard these three cases, or, for that matter, any one case as being dispositive of the "mug shot" issue raised here, it is useful at this point to discuss briefly the most pertinent cases in which the apparently uncomplicated principle has been found to have been quite difficult of application in the context of particular fact-situations that have occurred during trials.

We look initially, as we must, to our own circuit. Both parties herein recognize the importance of the case of United States v. Calarco, 424 F.2d 657 (2 Cir.), cert. denied, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 53 (1970). As might be expected, however, they differ in their evaluations of the application of that case to the facts we have before us in this case. In *Calarco,* where a criminal conspiracy was charged, certain "file photographs" of the defendant conspirators were introduced by the prosecutor for the purpose of proving that the defendants knew each other. Before being shown to the jury these "file photographs" had been "doctored" by having the written material on the back of the pictures covered over, and by carefully excising the incriminating numbers which appeared on the front. We upheld the introduction of the photographs under the circumstances of the case. This result was reached because we felt that the jury may well have inferred, if their suspicions were aroused at all, that these were photographs taken at the time the defendants were arrested on the charges for which they were then being tried and were not indicative of earlier contacts with the law. Judge Anderson did not allude to any incidents occurring during the introduction of the pictures into evidence that might have aroused the jury's suspicions regarding the source or nature of the photographs. We said that these photographs were not introduced to buttress and improperly color identification testimony, and we distinguished on this basis Barnes v.

**492**

United States, *supra,* the case upon which appellant places his primary reliance.

*Barnes* is one of the leading cases in which the admission of "mug shot" evidence has been held to constitute prejudicial error. There, at trial a witness identified the defendant as the perpetrator of the crime. On cross-examination defense counsel sought to emasculate this identification. What developed from his questioning was that the witness had at one point possibly equivocated about the live identification. More importantly, the defense also elicited from the witness information that the initial identification had been made from photographs exhibited to the witness by the police. In response to this line of inquiry the Government then bolstered the witness's pre-court identification by introduction on redirect of two photographs from which the initial identification of appellant had been made. The first photograph was a normal "full-length snapshot of an ordinary nature.", 365 F.2d at 510. The second, however, was "a typical 'mug shot' from a police department 'rogues gallery.' " *Id.* The mug shot had been altered so that the numbers were concealed by adhesive tape and the writing on the back was covered by paper.

Judge Leventhal particularly emphasized the crude and awkward fashion in which the pictures were introduced:

Here the makeshift taping was placed over the exhibit after it had been shown to the witness in the presence of the jury, after defense counsel, again in the presence of the jury, had objected to the introduction of the pictures, and after the prosecutor had asked the court if he could show the picture to the jury. (Reply: "Not yet. Come to the bench.") With this background it is disingenuous for the Government to argue that its Exhibit 3 probably appeared to the jury as merely a couple of ordinary photographs. (Footnote omitted). *Id.* at 511.

In addition, the trial court judge, by expressing his reluctance to permit the altered pictures to remain with the jury, probably aggravated the harm to the defendant by further drawing the jury's attention to the nature of the photographs. *Barnes* appears to have turned on two considerations. First, the Government had no legitimate interest in introducing the "mug shot" photograph, for the Government by introduction of the "snapshot of ordinary nature" had already accomplished its purpose of bolstering the testimony of the identifying witness. Secondly, both the method of introduction and the alterations on the photograph itself drew undue attention to the questionable status of the "mug shot." The court's comments with reference to the photographs are instructive and bear repeating:

The double-shot picture, with front and profile shots alongside each other, is so familiar from "wanted" posters in the post office, motion pictures and television, that the inference that the person involved has a criminal record, or has at least been in trouble with the police, is natural, perhaps automatic. The rudimentary tape cover placed over the prison numbers on the photograph, and over the notations on the reverse side, neither disguised the nature of the picture nor avoided the prejudice. If anything, by emphasizing that something was being hidden, the steps taken here to disguise the nature of the picture may well have heightened the importance of the picture and the prejudice in the minds of the jury. Id. at 510–511.

In finding the introduction itself objectionable, Judge Leventhal suggested alternative ways in which the possible prejudice to the defendant could have been ameliorated:

He stated:

The case illustrates the recurrent problem of jurors being aware of evidence sought to be introduced before defense counsel has a chance to object or the court [has] a chance to rule.

The proper procedure would be for the prosecutor to show defense counsel and the court the pictures outside the presence of the jury. *Id.* at 511 n. 5. He later elaborated:

In this case, as already noted, it was in the hearing of the jury that the prosecutor presented the photographs to the witness, asked her to identify them, and offered them in evidence. At that point the court called for a bench conference, but the jury's awareness was by then beyond recall. *Id.* at 512 n. 7.

The Government argued to the Court of Appeals that defense counsel had invited introduction of the incriminating pictures and had thus induced revelation of the defendant's prior record. The Court rejected that argument and pointed out that defense counsel's line of questioning which elicited information concerning initial identifications from photographs was vital and necessary:

This approach could not be put forward by defense counsel without some risk to the accused, for the testimony that the police had on hand photographs of the accused might conceivably have led a juror, at least a sophisticated juror, to hypothesize that the accused had a police record. But defense counsel was not required to pay the price of having defendant's criminal record dramatically and almost unmistakably placed before the jury through the jury's inspection of the mug-shot photograph with its supposed tape "concealment" of the underlying record. *Id.* at 512.

United States v. Harman, 349 F.2d 316 (4 Cir. 1965), quoted from *supra*, is a case in which unaltered "mug shots" of a defendant who did not take the stand were introduced at trial. Factors on which the decision turned were the rather graphic nature of the photographs, the introduction was neither casual nor inadvertent, and there was vigorous and timely objection by defense counsel.

In United States v. Reed, 376 F.2d 226 (7 Cir. 1967), quoted from *supra*, the prosecution insisted upon repeated references to "mug shots" of the defendant, which were then more graphically described as being "photographs of former inmates of the state prison." *Id.* at 227. Although in this instance the court looked primarily to the effect of the photographs themselves in determining prejudice, it further implied that another factor to be considered was whether alternative means were available to accomplish the purposes for which the pictures were used. See *id.* at 228, n. 2. In addition, the *Reed* court noted that the *Harman* court had doubted whether *any* instruction could have alleviated prejudice to the defendant. The Seventh Circuit, however, was not required to weigh the effect of a curative instruction because there had been none.[2]

The Third Circuit seems to approach the problem created by the introduction of mug shots by applying a "balancing test." For example, the court in United States v. Gimelstob, 475 F.2d 157, 161 (3 Cir. 1973), after balancing the "probative value of the mug shot" against "whatever prejudicial effects that it had," sanctioned the introduction of the photographs. The court, however, was assiduous in distinguishing the case from *Barnes*. In the first place, the

2. In a later case, United States v. Robinson, 406 F.2d 64, 65–66 (7 Cir.), cert. denied, 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 243 (1969), the Seventh Circuit found that a reference to the term "mug shots" had not been prejudicial where a comprehensive and immediate curative instruction had been given. Although the defense attorney there requested that a mistrial be ordered, there is no mention of his having requested the curative instruction given by the judge. The judge's instruction was so complete that he not only warned against an inference of prior criminality but he even offered alternative explanations. He pointed out that the police could well have in their possession pictures of private individuals—e. g., the FBI has photographs of all federal employees, "including [the trial judge] as a matter of fact." Id. at 65. Moreover, while upholding the trial judge's disposition of the issue, the Seventh Circuit nevertheless was careful to point out that the use of the term "[mug shots] was ill-advised and might call for reversal in some circumstances." Id. at 67.

**494**

court found the photographs contained no numbers or other inscription and so were "much less obtrusive," *id.* at 162, than the photographs in *Barnes*. But the pivotal point was that the mug-shot nature of the photographs was *already* known to the jury at the time of viewing because of the line of questioning persistently pursued by the defense. The court distinguished the defense questioning in *Barnes*:

> Furthermore, it does not appear that the defense inquiry in *Barnes* focused on the appearance of the appellant in pictures which the witness was shown. It instead concentrated on the fact that the identifying witness had been shown only pictures of appellant. *Id.* at 161.

The court stressed that "[s]ince what was shown to the jury was a mug-type photograph, i. e., there were no prison numbers or other marks present, the jury knew no more than they had [known] before as a result of the defense questioning." *Id.* at 162.

The final point of factual departure from *Barnes* was the absence here of any acceptable alternative means by which the Government could have accomplished its purpose.

Other cases offered by the Government include two cases decided after *Barnes* was handed down, United States v. White, 444 F.2d 1274 (5 Cir. 1971) and Anthony v. United States, 433 F.2d 952 (9 Cir. 1970), and one pre-*Barnes* case, Dirring v. United States, 328 F.2d 512 (1 Cir.), cert. denied, 377 U.S. 1003, 84 S.Ct. 1939, 12 L.Ed.2d 1052 (1964). In *White, supra,* the defendant claimed he was prejudiced by a government witness's display of a "mug shot." Although the court in dictum implied that this would not have been prejudicial, it never really reached that issue because the court was certain that the jury had not seen the picture for it was inside a folder held by the witness as he testified. 444 F.2d at 1279, n. 10.

*Dirring,* inasmuch as it antedated *Barnes,* did not discuss the reasoning adopted by the *Barnes* court when that court addressed some of the questions presently before us. Also, subsequent to *Dirring,* the First Circuit in Tallo v. United States, 344 F.2d 467 (1 Cir. 1965), another pre-*Barnes* case, had before it the issue of the propriety of the admission of evidence of a prior conviction. In *Tallo* the information had been elicited through an unresponsive answer of a government witness. Whereas the court found no prejudice in *Dirring,* it found sufficient prejudice to reverse the conviction in *Tallo. Dirring* and *Tallo* read in relation to each other indicate that the First Circuit would follow a sort of balancing test, in which the need for and propriety of the government actions are weighed against the possible prejudice to the defendant. We therefore do not regard *Dirring* as reflecting the most current judicial thought on the subject.

*Anthony, supra,* is a brief per curiam opinion which, relying on *Dirring,* admitted "mug shot" evidence. This case, however, is totally inapplicable here because a police officer expressly testified before the jury that the mug shot photographs were taken at the time of the defendant's arrest on the present charge. Thus, there was no chance whatsoever that the jury could infer a prior criminal record on the basis of the mug shots.

We believe that a pattern of appropriate analysis emerges from a consideration of these cases. We perceive three prerequisites to a ruling that the introduction of "mug shot" type photographs does not result in reversible error:

1. The Government must have a demonstrable need to introduce the photographs; and

2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and

3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.

We thus reach an application of the standards we have delineated to the fact situation in the present case.[3]

First, we must ascertain whether there was a "demonstrable need" on the part of the Government to introduce these photographs. The Government was surprised and probably seriously injured by witness Mancini's failure to make an in-court identification of Harrington. On the other hand, the Government produced testimony from two other witnesses directly connecting Harrington with possession of the stolen checks, and his fingerprints were on two of them. However, inasmuch as the expected identification from Mancini was an integral element in the scheme of the Government's proof, we conclude that this first prerequisite has been satisfied.

Next to be considered is whether the condition of the photographs, without more, prejudiced appellant's right to a fair trial. In this regard, it is helpful to recall Judge Leventhal's discussion in *Barnes* that the "double-shot" picture produces a "natural, perhaps automatic" inference of prior encounters with the police and that crude and inartful masking of these pictures heightens, rather than diminishes, their significance to the jury. 365 F.2d at 510–511. The photographs herein were "masked," but in a grossly incompetent fashion. Without basing our resolution of appellant's "mug shot" contention on the second element of the test we propose, we think that the preferable course of action when mug shots are to be introduced would be to produce photographic dupli-

cates of the mug shots. These copies would lack any incriminating indicia—i.e., inscriptions or identification numbers, and they could also avoid use of the juxtaposed full face and profile photographic display normally associated with "mug shots."

We reach the third prerequisite and find that the manner in which these photographs, themselves subject to suspicion, were introduced, focused the jury's attention on the pictures to the point at which prejudice may well have resulted. As to this third element the fact situation that arose at trial causes this case to fall squarely within the scope of *Barnes* and without the purview of *Calarco*. In *Calarco* there is no intimation that the admission of the evidence in any way focused the jury's attention on the source of the pictures. The contrary was true in *Barnes*. The court there quite properly dismissed the Government's artificial argument that the jury probably believed the pictures to be a couple of ordinary photographs.[4] Even a cursory reading of the transcript of the trial below indicates the awkwardness of the introduction.

Thus, as in *Barnes*, the whole debate over the propriety of the photographs took place in full view of the jury. However, when Judge Clarie objected to the photographs which the Government thought acceptable, and, with the jury looking on, ordered the court clerk to mask the pictures, the jury's attention by this time was undoubtedly riveted on them.[5] Under the

---

3. Of course, as we have pointed out earlier, if the defendant should take the stand or be responsible, without proper reason, for placing his prior record before the jury, then different rules would apply. Harrington did not testify on his own behalf. Nor was he responsible for the jury's acquiring its knowledge of his previous conviction.

4. The "mug shots" shown to the witness Mancini were apparently taken by the Hartford police at the time of appellant's arrest on a prior and unrelated charge of counterfeiting. A conviction followed the arrest. Taking judicial notice of a case in our own

court, we note United States v. Harrington, 474 F.2d 1336 (2 Cir.), affirming on April 12, 1973 a conviction in the United States District Court for the District of Connecticut. Case reported at 474 F.2d 1336, cert. denied, 414 U.S. 840, 94 S.Ct. 92, 38 L.Ed.2d 76.

5. The Government argues that the jury may have believed that the "mug shots" were taken at the time Harrington was arrested on the charge upon which he was then standing trial, that of receiving stolen money. On the facts before us this contention is unrealistic. We are convinced that any

circumstances of this case, in which a crucial government witness failed to make an expected identification and in which the other evidence against appellant was not overwhelming, we believe that appellant was prejudiced by introduction of the photographs in the manner described.[6]

juror who witnessed the introduction of these photographs under these circumstances could not have drawn the inference that the photographs were merely pictures taken at the time of appellant's arrest on the charges for which he was then being tried.

The jury observed the Assistant United States Attorney transferring to Judge Clarie the pictures which the prosecutor claimed had already been "all covered up." Contrary to the prosecutor's assurances, however, the pictures had *not* been properly altered at the time they were handed to the trial court judge. Judge Clarie thus felt compelled to order *further* alterations, an action which might have been unnecessary had the Government's performance matched its assurances to the judge. What the jury observed were a heated bench conference, an animated judge handling and pointing to the photographs, and the delivery of the pictures into the hands of the court clerk, who then quickly tried to convert them into the condition in which they should have been when they were handed to the judge.

Furthermore, we believe that the incidents which we find most prejudicial to the appellant could have been avoided by more responsible and less myopic prosecutorial conduct. The ineffective taping of the photographs prior to the offer of them demonstrates that the Government *did* in fact anticipate at least the possibility that the photographs would have to be used at trial. The dissent agrees "that when the Government anticipates or should anticipate the need for using mug shot photographs, it should take more effective means than taping to disguise their nature." Yet the dissent does not deny that when the mug shots in this case were given to Judge Clarie for inspection there had *already* been some sort of feeble attempt at taping (although it is difficult to imagine how the original alterations could have been more ineffective than the final product which we have examined).

**6.** *Redirect Examination by Mr. Sale:*

Q. Agent Brandon, placed before you are Government Exhibits 9, 9–A, 9–B, 9–C, 9–D and 9–E for identification. Are those the photographs that you displayed to Mr. Mancini?

A. They are.

Q. And you just heard him identify 9–C as being Red?

Mr. Clifford: Objection, Your Honor.

The Court: What is your objection?

Mr. Clifford: Your Honor, I think that I would ask for the withdrawal of the jury. I think what I have to say to the Court should be said outside the presence of the jury.

The Court: You make it at the Bench.

(Counsel approached the Bench and the following colloquy was out of the hearing of the jury.)

Mr. Clifford: Well, here we have the agent who has been sitting through the whole trial. There has been no identification of this Defendant and I think this kind of procedure is—you know, it's just wrong, to have an agent sit through a trial and now go in front of this jury and start picking out pictures when the witness himself can't identify the Defendant. You know, Your Honor—

The Court: Anything further?

Mr. Clifford: No.

Mr. Sale: The first thing I propose to ask the agent is to identify who is depicted in 9–C for identification.

Mr. Clifford: Well, the question comes: How does he know that and where does that come from?

The Court: Well, you will have the opportunity of cross examining the man.

Mr. Clifford: Sure. The point is pretty obvious where those kind of pictures come from. That is the problem.

The Court: When you say "Come from", you are not going to offer these pictures —they are not mug shots, are they? If so, you are not going to reveal about any past record?

Mr. Sale: Certainly not, Your Honor.

Mr. Clifford: There is no way now to correct that error. It is pretty obvious that most people know where pictures come from and you just don't throw down pictures in front of people without having —you don't have these kind of pictures—

Mr. Sale: That doesn't rule pictures inadmissible.

The Court: Is there anything on those pictures that identifies them as mug shots?

Mr. Sale: They're all covered up, Your Honor.

The Court: May I see them?

Mr. Sale: Yes. Sure. (Hands photographs to the Court.)

The Court: You don't propose to show the others; is that right?

Mr. Sale: Any others, no, Your Honor.

The Court: This part here (indicating) would have to be covered if you are going to offer that as you probably will. That should be covered completely so it can't be seen (indicating).

Mr. Sale: We will do that.

For appellant's second claim of trial error he argues that in introducing the "mug shots" of appellant Harrington the Government failed first to lay a proper foundation, as it must under the rules of evidence. Although a decision on this point is unnecessary, we find persuasive the Government's position that there was sufficient evidence adduced throughout the trial to establish the ability of Agent Brandon to identify the man in the mug shot as Charles Harrington, the defendant at trial and the appellant herein.

Reversed and remanded for a new trial on Count Two of the indictment.

FRIENDLY, Circuit Judge (dissenting in part):

Starting from an unduly broad statement of the "other crimes" rule,[1] the majority has yielded to the temptation of second-guessing, in the peace and quiet of appellate chambers, the reasoned action of an experienced judge faced with an emergency that had unexpectedly developed in the course of a trial.

The transcript makes it clear that Judge Clarie was keenly aware of the competing considerations involved in admitting mug shot photographs. He first told the Government that he would not admit the photographs if there was anything that identified them as prison mug shots or revealed that the defendant had a prior criminal record. He then examined the pictures and ordered the clerk to mask a larger portion than the prosecutor had already done. In view of his obvious sensitivity to the problem, I would reverse only if convinced, which I decidedly am not, that he had clearly abused his discretion in handling it.

In my view the majority's three-pronged standard should be regarded as a useful enumeration of factors to be given appropriate weight rather than as a strict rule each branch of which must be fully met. However, even on the majority's approach, we should affirm this conviction.

The first of the three factors is need. I agree that this is highly relevant since, in weighing probative value against possible prejudicial effect, the probative value of merely cumulative evidence may be quite small. In addition, requiring a demonstration of need should help to screen out cases in which the Government tries to introduce evidence not for legitimate probative purposes, but merely to demonstrate that the defendant has a criminal record.[2] In this case, however, the evidence was plainly needed. The prosecution's eyewitness had unexpectedly faltered on the stand, and the Government required some means of rescuing this rather critical portion of

---

The Court: Or have it cut off as far as that is concerned.

Mr. Sale: We will do that so there is no problem.

Mr. Clifford: This is so prejudicial, it is unbelievable. It is incredible.

Mr. Sale: Your Honor, those kind of labels don't add to the argument.

The Court: Do you want it cut off or paste over it?

Mr. Clifford: I object to this. I will object to these all over the place.

The Court: Certainly. The objection is overruled. Ask the Clerk to cover these up in such a manner they are pasted over and cannot be revealed otherwise.

(Counsel returned to their respective tables).

1. The settled rule in this circuit, most notably expressed in Judge Anderson's opinion in United States v. Deaton, 381 F.2d 114, 117

(2 Cir. 1967), is "that evidence of other crimes is admissible except when offered solely to prove criminal character," although I agree with the majority that this precludes a generalized showing of *some* criminal record.

2. The court in Barnes v. United States, 124 U.S.App.D.C. 318, 365 F.2d 509 (1966), upon which the majority heavily relies, was obviously concerned that the prosecution had sought to get the mug shots before the jury for the improper purpose of suggesting that the defendant had a criminal record. See 365 F.2d at 512. It stressed that the prosecution had already introduced an unobjectionable photograph of the defendant, but persisted in pressing the judge to admit the mug shot photograph, even though it would be merely cumulative for identification purposes.

its case. There is no indication in the record that the Government had any other means of doing so; indeed, the majority concedes that the need condition was met.

The majority next directs inquiry to whether the pictures themselves revealed or suggested to the jury that Harrington had a criminal record. In United States v. Calarco, 424 F.2d 657, 661 (2 Cir.), cert. denied, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 53 (1970), we noted that mug shots, without more, are not so suggestive of a criminal record that they should never be admitted into evidence:

> introduction of these file photographs, as modified, was not likely to cause the jury to infer the existence of prior criminal convictions. It is much more likely that the jury assumed they were taken by the police when the appellants were arrested on the charges for which they were then being tried.

The same is true here.[3] In fact, as the majority points out, the photographs in question were taken not after a conviction, but at the time of Harrington's arrest for another crime. The majority says it is "unrealistic" to suppose that the jury may have believed that the mug shots were taken at the arrest in this case, but does not adequately explain why; despite the labored attempt in fn. 5 of the opinion, the majority is scarcely convincing in its argument that the jurors must have thought that Harrington's photographs recorded a conviction which in fact they did not. On this

point also the Government is entitled to a favorable finding.[4]

The majority ultimately rests its holding on the third branch of its three-pronged test, concluding that the manner in which the photographs were introduced drew the jury's attention to them and rendered them more prejudicial than they might otherwise have been. Of course, there may be cases in which the manner of introduction adds substantially to the prejudicial effect of evidence, but it is not enough for the defendant simply to point out that the admission of the evidence occasioned objection, or even a heated bench conference. In order to warrant reversal, the manner of introduction must somehow create or reinforce the suggestion that the defendant has a criminal record. Although the bench conference in this case included vigorous protest from defense counsel, the prosecution did not cajole a reluctant judge into admitting the pictures, as was apparently the case in *Barnes*. Instead, it appears from the transcript that the judge handled the conference smoothly and efficiently. It would unduly strain the chain of inferences to suppose that a jury would be likely to conclude from the bench conference and subsequent taping of the pictures that the photographs, which, as stated, were taken at the time of defendant's arrest in another case, must have been police file photographs indicating that the defendant had a prior criminal record. It is also unclear to me just what better course the judge had available once the bench conference had begun;[5] if he or-

3. A similar point was forcefully made in Judge Prettyman's dissent in *Barnes*: "to the lay public these 'shots' show a man *wanted* by the police, not necessarily one convicted." 365 F.2d at 515.

4. In both United States v. Reed, 376 F.2d 226 (7 Cir. 1967), and United States v. Harman, 349 F.2d 316 (4 Cir. 1965), relied on by the majority, either the Government's comments before the jury or the identifying marks on the photographs made it patently clear that the "mug shots" were prior prison photographs, and thus graphically demonstrated that the defendant had a prior record. The Seventh Circuit made plain the limited scope of the *Reed* decision in United

States v. Dichiarinte, 385 F.2d 333, 337 (7 Cir. 1967), cert. denied, Mastro v. United States, 390 U.S. 945, 88 S.Ct. 1029, 19 L. Ed.2d 1133 (1968) ; United States v. Schwartz( 398 F.2d 464, 470 (7 Cir.), cert. denied, 393 U.S. 1062, 89 S.Ct. 714, 21 L.Ed. 2d 705 (1968), and United States v. Robinson, 406 F.2d 64, 65–66 (7 Cir.), cert. denied, 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 243 (1969).

5. Defense counsel protested before us that the conference was held at sidebar without having the jury withdrawn. However, the transcript shows that the objection which counsel wished to make was to having "an agent sit through a trial and now go in

.dered a recess to permit the Government "to produce photographic duplicates of the mug shots," as the majority suggests, the jury's interest and suspicion might have been excited even more. In fact, Judge Clarie offered to have the legends cut off, but defense counsel objected to the introduction or use of the pictures under any conditions.

I agree that when the Government anticipates or should anticipate the need for using mug shot photographs, it should take more effective means than taping to disguise their nature. But here the Government had no reason to anticipate the need, and we do not even know in what respect its taping failed to measure up to the desires of Judge Clarie, who handled the matter fairly under the emergency that had unexpectedly developed. A degree of perfection attainable only by 20–20 appellate hindsight is not required of trial judges.

See also 428 F.2d 606.

front of the jury and start picking out pictures when the witness himself can't identify the Defendant." There was nothing in this to require withdrawal of the jury. In any event à trial judge's decision on such a point should not be ground for reversal.