HARRIS, Judge.
Appellant was convicted of assault with intent to murder and the Court sentenced him to twenty years imprisonment in the penitentiary. He was found to be indigent and attorneys from the Public Defender’s Office of Tuscaloosa County were appointed to represent him. He is in this Court with a free transcript and trial attorneys were appointed to represent him on appeal. At arraignment, in the presence of his attorneys, he pleaded not guilty and not guilty by reason of insanity.
Pursuant to Title 15, Section 428, Code of Alabama 1940, the Court ordered appellant committed to Bryce Hospital for examination to determine his mental status, and to determine when he would be capable of rendering assistance to his counsel in the trial of his case. Upon the coming in of the report from the Staff at Bryce Hospital that appellant had been restored to his right mind, it was ordered that the case proceed to trial. Prior to trial appellant withdrew his plea of not guilty by reason of insanity.
The evidence is undisputed. Appellant did not testify and he did not offer any evidence in his behalf. The evidence adduced by the State established a clear case of guilt.
On January 12, 1977, the victim was a student at the University of Alabama and resided at the Tutwiler Dorm located on the campus of the University. Around 3 o’clock *735 on the afternoon of that date she drove her car from class to the parking area of Tut-wiler Dorm. When she pulled into a parking space she got out of her car and opened the back door to remove some things from the car and at this point a car pulled into a parking space next to her car. She felt someone behind her and she turned around and saw the car which was parked beside her had a plastic covering on the window over the passenger side. As she turned around she was face to face with a man who put his hand over her mouth and stuck a gun in her stomach. This man told her to get back in her car and she jerked her head away and started screaming. The man shot her and immediately got in his car and left. The victim stated that the attempted abduction and shooting occurred within the span time of two to three minutes and that during this period of time she was looking straight in the face of her assailant. She made a positive in-court identification of appellant as the man who put his hand over her mouth and shot her in the stomach.
She further testified that after she was shot she stood there for a few seconds and someone came up and asked her if she was all right. She was bleeding and a woman took her to a ear to wait on the ambulance. She was carried to the emergency room at Druid City Hospital where she was seen and treated by Dr. Floyd Fitts.
On cross-examination she testified that she got a good look at this man during this two to three minutes and she described him as having medium length hair and a mous-tache. She said he was wearing blue jeans and some type of flannel shirt. He was driving an old model car that was blue in color.
It was further developed on cross-examination that the victim had seen some photographs of the defendant on the morning of the trial. These photographs were not shown to her for the purpose of identification by any law enforcement officers or the District Attorney. She was sitting in the District Attorney’s Office on the morning of the day of the trial and just happened to see a number of photographs on his desk and she looked at them. They were photographs of the defendant and she recognized him. There were other photographs on the desk, of her car, and the parking lot where she was shot. She further testified that she was not basing her identification of appellant on the photographs she just happened to see in the District Attorney’s Office. She stated that the photographs of appellant that she inadvertently saw in the office of the District Attorney did not aid her in any way in the identification of appellant but on the contrary her identification was based solely on the face to face confrontation of him during the two or three minutes she saw him when he grabbed her, put his hand over her mouth and then shot her.
She further testified as to the difference in the appearance of defendant at the time of the trial and the day he shot her. She stated that appellant’s hair was a little shorter at the time of trial than it was on the day that he attempted to abduct her and then shot her, and that she had an independent recollection of appellant in spite of the pictures she saw on the morning of the trial; that these photographs in no way aided her in the identification of appellant.
There were several people near the place where the shooting occurred who saw the man struggling with the victim and heard the shooting. They thought at first that this was a struggle and fuss between a “boyfriend and a girl friend.” After the shooting they observed the man run to his car and drive away. They described the man to the officers just as the victim had described him and two of them testified that appellant looked like the man who shot the victim but would not make a positive identification.
Mrs. Louise Green testified that she saw a girl struggling with a man as she was driving by the Tutwiler Dorm. She noticed the girl slump back and fall into a car and then saw the man run in her direction with a gun in his hand. The man got into a vehicle and drove past her at which time she read his tag number which she identified in court as being the tag number of *736 appellant’s car. Mrs. Green further testified that in her opinion appellant was the man who shot the girl.
Mr. John Brown, a University police officer, testified that he arrived on the scene, attempted to stop the victim’s bleeding and called for an ambulance. He also took statements from several witnesses from which he developed a composite description of appellant and his car which was put on a radio dispatch. About an hour later State Conservation Officers Gill Green and Sammy Anders saw appellant parked in his car on an unpaved dead-end road. When the officers went to check the car they saw appellant move a pistol from his lap to the middle of the seat. The officers reached in the car and got the pistol and laid it on the hood of the car. Officer Green identified appellant as the man they apprehended. Green further testified that appellant attempted to leave the car and a struggle ensued to prevent his escape. They notified the Tuscaloosa Police Department and appellant was taken into custody.
When the police officers arrived they transferred him from the Conservation Officer’s car to their patrol car, handcuffed him, read him the Miranda rights and warnings, and transported him to the Homicide Office of the Police Department. These officers also took into their possession a .22 caliber revolver and six cartridges which they turned over to Sergeant Dempsey Marcum. Marcum delivered the pistol and cartridges to Mr. Jim Britton of the State’s Toxicology Department in Tuscaloosa.
State Toxicologist Britton testified that the .22 caliber revolver and a box containing six cartridges were delivered to him by Officer Marcum. He said that he test-fired two of the cartridges and stated, “The results I obtained reveal that the cartridge cases in State’s Exhibit 2 were detonated in the mechanism of this pistol.” The pistol recovered from appellant was identified and introduced into evidence as State’s Exhibit 1.
Dr. Floyd Fitts testified as to the damage the bullet caused upon entering the victim’s body. In the doctor’s own words he stated, “The abdomen was opened and the bullet had not actually entered the abdominal cavity. It had skirted around and hit the little iliac crest, or this bone which is shaped obliquely — hit it and ricocheted back toward the midline and the bullet (was) lying in the muscle structures posteriorly, out of the abdominal cavity. I did not remove the bullet at the time, because it would have been much easier to remove from a different approach.”
Officer Marcum further testified that he interviewed appellant the afternoon of the day of the shooting. Before he asked appellant any questions he read him the Miranda rights and warnings and he signed a waiver of rights form in which he stated that he understood his rights.
After the proper predicate was laid appellant made and signed a confessory statement which was then read to the jury.
From the record:
“Q. Now, in relation to this statement, I’d like to ask whether or not he made any statement to you concerning his whereabouts in relation to the University Campus?
“A. Yes, sir.
“Q. All right, sir, and where did he say he was?
“A. Stated in the parking lot behind the Corner Drug Store off of 10th Street.
“Q. All right, sir, and are you familiar with the area that he’s speaking of?
“A. Yes, sir, I am.
“Q. Would this be the parking lot behind Tutwiler Dorm?
“A. It would be.
“Q. And did he make any references to anyone that he may have seen there in that lot?
“A. Yes, sir, he did.
“Q. What did he state to you about that?
“A. Stated, saw a girl in a red, fairly new car pull in and park.
“Q. And did he make any statements as to what happened after that?
“A. Yes, he did. Stated he parked beside of her. Got out of his car and walked around the car to where she was.
*737 “Q. Go ahead.
“A. Stated, he had his 22 caliber pistol that he had bought four or five days or longer, from a drunk man at the Ponde-rosa Lounge in Northport for $25. Stated, he pointed the pistol at her and told her to sit down, meaning in her car. Stated, ‘she pushed me away and I stumbled back and moved back toward her and pushed her down towards the seat. That’s when the gun went off and she started screaming and started bleeding. I put my left hand over her mouth. She was slumped over leaning against her car door. I got in my car and left. I came out by the Krystal and turned left. Then at the book store across from the Krystal I turned right, went to the River Road and turned left, to the old dump down Clinton Drive. Down the Sanders Ferry Road. I turned off the Sanders Ferry Road to the right to the old dump and parked. I had been there a couple of minutes when the Game Wardens drove up and got out of the car and wanted to take it and I wouldn’t let him. When they were driving up, I took the empty shells out and loaded another round in the pistol. One of them asked me to give it to him and I said, “No.” I laid it on the seat and one of them reached in and took it. They asked me what I was doing down there and what was wrong. I told them I had shot somebody. In a little while, the Deputy Sheriffs came and got me and brought me here. Signed, Bobby Weaver.’ ”
Appellant contends that an impermissibly photographic display was made which may have resulted in the misidentification of appellant. We do not agree. The record does not in the least support the contention of appellant. The evidence in this case does not show there was a “line-up identification,” nor a “show up,” nor a “photographic display,” in which the victim identified the appellant as the man who shot her. The evidence does show that on the morning of appellant’s trial the victim was alone in the District Attorney’s Office and just happened to see a number of photographs of appellant on a desk in that office. She flipped through a stack of photographs on a desk in the office and recognized appellant. She did not see the name of appellant on any of the photographs.
From the record:
“Q. Let me ask you this. Would you have an independent recollection of the Defendant in spite of those pictures?
“A. Yes.
“Q. Did those pictures in any way aid your identification of this man?
“A. No.”
No one connected with the police or the Prosecutor’s Office showed her the photographs or told her to view the photographs to see if she recognized appellant. This is a clear case of “an independent source.” The victim had a face to face confrontation for two to three minutes at the time he put his hand over her mouth when she was screaming and at the time he put the pistol against her stomach and shot her. She made a positive in-court identification of appellant and that was the only identification the victim made in this case.
The most recent United States Supreme Court case dealing with this issue is Manson v. Brathwaite, - U.S. -, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In Manson, pretrial identification from a single photograph which was both suggestive and unnecessary was held not to be so improper as to prevent identification of the defendant even though the witness had only observed the defendant for a “couple of minutes.” The Court held that identification testimony would be admissible if under the “totality of circumstances” the identification is reliable. The Court went on to say:
“We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), confrontations.”
Factors to be considered include “The opportunity of the witness to view the criminal at the time of the crime, the witness’s degree of attention, the accuracy of his prior description of the criminal, the level *738 of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.” Manson, supra.
Applying these factors in the present case we find the victim looked at her assailant the entire time, face to face for two or three minutes at close quarters during daylight hours. The victim was not a casual or passing observer. Her attention was focused directly on the man who put his hand over her mouth and put the gun to her stomach and shot her. The record does not indicate the victim gave a description to the police as she was rushed to the hospital for medical treatment. Other witnesses at the scene did give an accurate description of the gunman and he was arrested and confessed the very afternoon of the shooting and long before the victim recovered from her wounds. The victim made a positive identification of her assailant at trial and was subjected to a vigorous cross-examination during which she accurately described the defendant’s facial features and clothes at the time of the shooting.
The shooting occurred on January 12,1977, and the in-court identification was made on May 23, 1977, a period of about four months. Reliability is still the “linchpin” in identification testimony.
In Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401, the Supreme Court of the United States upheld a conviction based on an identification which took place over seven months after the crime.
Under the totality of the circumstances in this case, there does not exist “a very substantial likelihood of irreparable misidentification.” Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247.
We hold that the in-court identification of appellant was not tainted by the happenstance that the victim saw photographs of the appellant on the morning of the trial. This is a clear case on “independent source.” She knew him because she saw him face to face for two or three minutes while appellant was struggling with her in broad daylight and at the time she was shot. Hannon v. State, 48 Ala.App. 613, 266 So.2d 825.
We have carefully searched the entire record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.