**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Tracy Melvin BOWERS, Defendant-Appellant.**

No. 77–5193.

United States Court of Appeals, Fifth Circuit.

Feb. 16, 1978.

William T. Lassiter, Jr., Jacksonville, Fla. (Court-appointed), for defendant-appellant.

John L. Briggs, U. S. Atty., Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before GOLDBERG, AINSWORTH and FAY, Circuit Judges.

FAY, Circuit Judge:

Defendant, Tracy Melvin Bowers was convicted of conspiracy to distribute approximately 635 tablets of lysergic acid diethylamide (L.S.D.) and possession with intent to distribute the same L.S.D. and received concurrent sentences of three years imprisonment followed by a three year special parole term on each charge. Bowers assigns error to (1) the trial court allowing in evidence on rebuttal by the government certain "mug shots" for the purpose of impeaching the defendants' and another defense witness' testimony concerning Bowers' physical appearance before and at the time of the offense and (2) the trial court denying the motion for mistrial when the custodian of the "mug shots" responded to certain questions asked by the government in order to lay a predicate for their admission. We affirm.

As testified to by Special Agent Douglas Driver of the Drug Enforcement Administration (DEA), on the evening of July 1, 1974, he, along with informant, Isaac Green, after meeting at the Jacksonville Beach Police Department, went to an apartment at 410 North Third Street, Jacksonville Beach, Florida.

Upon arriving there, they entered an apartment on the second floor and met an individual named Leon. Leon was described as having a very long, full beard and long blond hair "that was kind of sticking out" (R. 88).

Conversation with Leon ensued concerning a purchase of L.S.D. In the presence of

Driver, Leon placed a telephone call and asked whoever answered to page Tracy Bowers. Leon then told whoever had responded to the page that he had someone who wished to purchase some mescaline [1] and had the money with him.

A few minutes later a man arrived, who Driver identified as the defendant, and negotiations commenced for the purchase from Bowers. Driver agreed to pay $500.00 for 750 L.S.D. tablets. The defendant allegedly had 1000 tablets with him so, after some difficulty, 250 tablets were counted out and Driver and Green left with the rest of the tablets.[2]

Special Agent Driver was cross-examined extensively concerning the fact that it was a long time (over 2½ years) since the transaction had taken place and that no other witnesses except he and the informant had seen the defendant at close range. The informant did not identify the defendant at trial.

The defendant's main line of defense was a mistaken identification of the defendant by Driver. During this cross-examination Driver testified as follows:

Q. All right, sir. At that time did you make any description of the Defendant, the person that you were dealing with who you allege to be Tracy Melvin Bowers?

A. Yes, sir.

Q. What description did you report of him, sir?

A. I said Tracy Melvin Bowers was a white male, date of birth 2–19–52, 5 feet 11 inches tall, 120 pounds with brown eyes and brown hair. I listed his FBI number. Do you want the whole physical description?

Q. Just his physical description, yes, sir. Did he have a beard or a mustache at the time?

A. I stated that Bowers wears his hair long and has a mustache.

Q. All right, sir. Now Mr. Bowers today has a full beard. Is that the way he looked at the time you saw him in July of 1974?

A. No.

Q. Did he have just a mustache?

A. He had long sideburns and a mustache.

Q. Long sideburns. He had no hair down on his cheeks or on his chin down here?

A. He may have had a goatee.

Q. A goatee. Well, when you say a goatee, would you say—well, you say he may have had. Do you know whether or not he had a goatee?

A. I don't recall specifically if he had just a mustache, a bushy mustache, or if he had a goatee. I believe he had a goatee also, but it wasn't a full beard, it wasn't connected to the sideburns.

Q. The other fellow, Leon, you describe as having a full beard, isn't that correct, sir?

A. Yes, sir.

Q. So, you made a distinction between Leon and the man you call Mr. Bowers as one having a mustache and one having a full beard?

A. Yes, sir. (R. 72–73) [3]

Defense counsel, in his opening statement made immediately before he presented his case, stated he would establish that Bowers had always worn his facial hair in a manner inconsistent with that described by Special Agent Driver and that the agent had made

---

1. Although the parties described the drugs as brown mescaline the final sale involved pink L.S.D. tablets.

2. A chain of custody of the drugs was subsequently agreed to by stipulation. The final count by the government's lab found a total of approximately 635 tablets that were sold to Driver.

3. At one point in his testimony Driver was asked:

Q. What about the Defendant, Mr. Bowers? What *is* his hair? [Emphasis added]
A. It is predominantly blond. (R. 71)

We note this description is of Bowers at the time of trial. No further description of Bowers beyond that in the text or here was made by Driver during his testimony.

the drug transaction with someone other than the defendant.

Defense witnesses included, the defendant, his wife, Debra, David Cole and Isaac Green. Mrs. Bowers testified she had known the defendant since March, 1974, when she first began dating him. They were married in October, 1974. Since March, 1974, she testified Bowers had always had a beard but she also termed his facial hair as a goatee. The defense introduced a picture of the defendant taken by Mrs. Bowers when she first met him. In the picture, Bowers had a moustache, goatee and long brown hair with blond highlights (possibly from the sun).

David Cole was an acquaintance of Bowers who had known him since approximately 1973. Cole testified he was present at the apartment on the evening of July 1, 1974, and saw the informant, Isaac Green arrive alone. When Cole entered he testified Bowers, among others, was sitting in the living room. Green was in the kitchen with others Cole did not see. (Driver had testified the drug transaction and counting took place in the kitchen). In describing Bowers, Cole stated Bowers had always had a beard and the same color hair since he had met him.

The defense then called as an adverse witness the informant, Isaac Green. He testified that the "Tracy" with whom he and Special Agent Driver had dealt on July 1, 1974, had a moustache but the defendant was not the same individual. He did state the individual they dealt with had long, brown hair.[4]

Defendant's testimony indicated he was present in the apartment on July 1, 1974, but did not engage in a drug transaction. He testified he saw the informant enter but was not sure if anyone came in with him.

Green went to the kitchen with "Bill" (apparently the person who lived in the apartment and managed the building). He also testified he had had a full beard, meaning one connected with his sideburns, for eight or nine years. Bowers had never been convicted of a felony.

Rebuttal by the government began with the recall of Special Agent Driver. He testified that he used a police photograph or "mug shot" of Bowers to identify him on the day after the drug transaction. The mug shot, entered into evidence (Exhibit 3), was taken on February 12, 1974, and shows Bowers as having light brown hair with blond streaking, a wide moustache, and a goatee. He has long sideburns but little facial hair on his cheeks. At defendant's request the jury was instructed that this exhibit could only be considered for purposes of identification.

The government next called Shelly Raymond Knight, a supervisor with the identification section of the Duval County Sheriff's Office. Bowers objected to his testimony[5] but eventually agreed to Knight's being specifically instructed out of the hearing of the jury, not to make known to the jury any charges that had been brought against Bowers. He then testified as follows:

Q. (by Mr. Mueller, U.S. Attorney) All right. How long have you been engaged in that profession, Mr. Knight?

A. Nineteen years and four months.

Q. And can you briefly describe your duties in that capacity?

A. In my capacity with the Sheriff's Office, I am custodian of the criminal history and all records that are made by the police officers on the street.

Q. All right. Now, in that capacity did you at my request bring with you

---

4. Cross examination revealed Green had been arrested on a federal firearms charge in January, 1975, and apparently there was no "love" lost between him and the government.

5. Mr. Lassiter: At this time, I'm going to enter an objection to any testimony by this witness concerning identification. Number one, this seems to me to be more like new evidence,

additional evidence that could have been brought in the Government's case in chief, and it is not rebuttal to anything else that was said in the courtroom if it goes to further identification procedures or anything of that nature. We did go omnibus in this case. The Government understood—

(R. 155)

today certain photographs that are maintained in your files?

A. Yes, sir.

Mr. Lassiter: Your Honor, I have to enter an objection at this point and request permission to approach the bench again.

The Court: All right, just come on. (At the bench):

Mr. Lassiter: Your Honor, the Defendant objects and moves for a mistrial on the grounds that this witness was— the first thing he said is that he was custodian of the criminal records.

The Court: He asked him what his duties were.

Mr. Lassiter: Yes, and then did you bring—

The Court: He can't tell a lie. Those are a part of his duties.

Mr. Lassiter: I understand that, but now he has gotten part of his criminal file.

The Court: I'll give you an opportunity to give me whatever instruction you want me to give the jury and I'll give it for you. Get it to me during the lunch recess and I'll give those instructions as a part of my charge. (In the hearing and presence of the jury:)

Mr. Mueller: May I please have those photographs.[6]

\*  \*  \*  \*  \*  \*

Q. (by Mr. Mueller:) Mr. Knight, are those particular photographs associated with a name on a particular file that is maintained in your custody?

A. Yes, sir, they are.

Q. And what is the name?

A. Tracy Melvin Bowers.

Q. Now, do those photographs indicate on them the date upon which they were taken?

A. Yes, they do.

Q. And is it normal procedure to have the date on which a photograph is taken indicated right on the photograph?

A. Yes, sir.

Mr. Mueller: Your Honor, I would move that those photographs be admitted in evidence as Government's Exhibit Number 4.

Mr. Lassiter: We would object, Your Honor, for numerous reasons. The first reason is that there has been no showing who took the photographs. They may be acceptable under the business records act, but I haven't even—

The Court: I think you are going to have to ask him to qualify these records, if these records normally kept in the course and scope of business. Are these entries made shortly after the occurrence of the event, that is, the taking of the photographs. I think the objection is good at this time.

Mr. Mueller: Fine. I was just afraid to inquire along these lines for fear of getting into the area you didn't want us to get into.

The Court: Well, you have to now, because he has made an objection. I don't know whether Mister—

Mr. Lassiter: Your Honor, by making an objection I don't abandon anything.

The Court: I understand that, but I think maybe—All right, go ahead. You are putting him to the proof now and I can't help this. All right, you may continue.

Q. (by Mr. Mueller:) Now, can you describe the normal procedure for taking photographs of this type, Mr. Knight?

Mr. Lassiter: Your Honor, I again request Your Honor to instruct the witness concerning the precautionary instruction.

The Court: He understands it. All right. I'm sure he understands. He wants to know if you followed the usual

---

**6.** The part of the record during which photographs were marked for identification is omitted.

and customary procedure in taking these pictures.

The Witness: Yes, sir, we sure do.

The Court: Are these done as a part of the regular course of your business there in this department?

The Witness: Right.

The Court: All right, go ahead. With that in mind, let's get right into it.

Q. (by Mr. Mueller:) And what is the normal procedure?

A. Well, the normal procedure is each time a person is arrested and placed in the Duval County Jail, a mug shot with the date and the arrest docket number is taken on each individual.

Mr. Lassiter: Objection, Your Honor, and I move for a mistrial.

The Court: I'll sustain the objection. Now, members of the jury, the fact that these photographs were taken, you are not to consider the fact that this man has ever been arrested and there is absolutely no evidence that he ever was convicted. There certainly is no evidence of a conviction or an arrest in this case, and I want you to disregard the last statement. I will deny your motion for mistrial. Let's proceed.

Mr. Mueller: Your Honor, I would move them in evidence.

The Court: I'll receive them in evidence.

Mr. Mueller: I have no further questions.

Mr. Lassiter: Note the objection of this defendant, Your Honor.

The Court: Yes, I will note your objection. These are all kept in the regular course of the business of the department over which—

The Witness: Yes, Your Honor.

The Court: And you are the custodian of these records, is that correct?

The Witness: Yes, sir.

The Court: And the entries with reference to these records are made contemporaneously or shortly after the entry shown on the photograph, is that right?

The Witness: Yes, sir.

The Court: And they are a part of your official records, is that right?

The Witness: Yes, sir.

The Court: All right, I'll overrule the objection.

The Clerk: Government's Exhibit Number 4 received in evidence. (R. 157–163)

Government's Exhibit 4 consists of a set of four mug shots of the defendant. The first is dated November 11, 1973, and reveals defendant had a moustache but no beard and his hair was almost shoulder-length and light brown with blond streaking. The second, dated February 12, 1974, is a duplicate of Exhibit 3. The third is three pictures taken on January 6, 1975, and shows defendant with a full beard and slightly shorter and darker hair. The fourth, dated December 12, 1976, again reveals a full beard but the hair is lighter with blond streaks.

The jury was again instructed with the approval of the defendant that the photographs could not be considered for purposes other than identification. Mr. Mueller stated they were introduced to impeach defense witnesses.

Bowers cites *United States v. Harrington*, 490 F.2d 487 (2nd Cir. 1973), in which the court set forth three factors to be used in determining whether or not the introduction of "mug shots" would result in reversible error.

1. The Government must have a demonstrable need to introduce the photographs; and

2. The photographs themselves, if shown to the jury must not imply that the defendant has a prior criminal record; and

3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs. 490 F.2d at 494.

The Fifth Circuit spoke on the issue of mug shots in *United States v. Davis*, 487 F.2d 112 (5th Cir. 1973), *cert. denied*, 415 U.S. 981, 94 S.Ct. 1573, 39 L.Ed.2d 878. In

*Davis,* this court affirmed a trial judge's removal of any identifying marks from the pictures and his prevention of any highlighting of the pictures during testimony. However, in *Davis,* the photographs were offered during the government's case in chief and the defendant's subsequent testimony as to a prior conviction was found "to obliterate any possible prejudicial effect upon the jury . . ." *Davis,* 487 F.2d at 121.

More recently, in *United States v. Rixner,* 548 F.2d 1224 (5th Cir. 1977), the prosecution introduced in its case in chief during re-direct examination of its witness five photographs of five black males showing frontal and profile views but with their identification numbers on the front excised. The witness had previously used them in the United States Attorney's office to identify defendant-Jones. Each of the photographs introduced had information on the backs concerning prior criminal records except Jones' who had no priors. Jones did not take the stand or place his character in issue. The Court found the admission of mug shots into evidence was error but declared it harmless in this case in light of the strength of the evidence against him.

However, the facts of this case require an exception to this present rule of exclusion.

Our exception is based on an analogy to *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). In *Harris,* petitioner contended ". . . a statement made by him to police under circumstances rendering it inadmissible to establish the prosecution's case in chief under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), may not be used to impeach his credibility." 401 U.S. at 222, 91 S.Ct. at 644. The Supreme Court disagreed and stated:

Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize traditional truth-testing devices of the adversary process. [Footnote omitted]. *Harris, supra* at 225, 91 S.Ct. at 645.

That is what the government did in this case. After defendant and one of his witnesses testified he had had a full beard for a period of at least four years prior to trial, the prosecution was properly permitted to impeach their testimony by showing photographs of defendant in that time frame without a full beard.

We are not holding that prejudice did not result from the introduction of "mug shots" with all indicia of their source apparent on their face showing four arrests. We are holding, however, that as a result of defendant's objections to the admission of these photographs and his failure to concede or stipulate to their authenticity he invited any error that occurred in their admission in their original form or in Mr. Knight's testimony as to authenticity. *Walder v. United States,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954); *United States v. Doran,* 564 F.2d 1176 (5th Cir. 1977); *United States v. Taylor,* 508 F.2d 761 (5th Cir. 1975). The failure of the defendant to concede authenticity also prevented the trial judge from removing the criminal record indicia from the photographs.[7] The government was put to the task of laying a sufficient predicate for the photographs. The trial judge properly instructed the jury as to their limited use. Under these particular facts, no error was committed.

Affirmed.

---

**7.** We note, however, that if the defendant had not objected to the introduction of the photographs or challenged their authenticity, and had instead requested that the mug shots be disguised so as to minimize their potential prejudicial effect, introduction of the undisguised photographs would have constituted error.

*United States v. Harrington, supra* ; *United States v. Davis, supra.*