Appellant, a fifteen year old, was by the Family Court of Jefferson County found to be a delinquent child who cannot be made to lead a correct life, and cannot be properly disciplined under the provisions of Section 12-15-34, Code of Alabama 1975. He was therefrom transferred to the jurisdiction of the Circuit Court to be tried as an adult for armed robbery. He was indicted for robbery and counsel was appointed to represent him. At arraignment, in the presence of appointed counsel, he pleaded not guilty. He was subsequently convicted of robbery and the trial court sentenced him to ten years imprisonment in the penitentiary. After sentence was imposed he gave notice of appeal and was furnished a free transcript. Trial counsel represents him on this appeal. *Page 1226 
Albert Ray was employed by Hendon Parking Company on October 13, 1978, and was in the main office located at 209 1/2 Twenty-First Street, North, Birmingham, Alabama. He was employed as a "lot audit" to collect the daily proceeds from forty-two parking lots run by the company. The attendant at each lot would take the daily receipts to Mr. Ray's office at the close of business each day. On October 13, 1978, all lot attendants had checked in with Mr. Ray except one and he was sitting in the office awaiting the arrival of the last lot attendant. The door to the office could not be opened from the outside. Mr. Ray saw a man approach the door and thought he was the last lot attendant coming to check in. It was dark outside and Mr. Ray could not see the man well enough to recognize him. He opened the door and was immediately grabbed from the rear by a man wearing a cap. Another man immediately entered the office with a gun and told Mr. Ray to "lay down, lay down, I don't want to hurt you." Mr. Ray complied with this command. The office was well lighted and while Mr. Ray was on the floor the man held the gun about one foot from his head and he got a good clear view of the gunman's face from ten to twenty seconds. The gunman was wearing a toboggan type cap and he described the gun as chrome plated and it looked like a .32 caliber pistol. While Mr. Ray was held captive the first intruder took approximately $818.00 from the desk drawer and placed the money in a night deposit bag. Then both bandits quickly departed.
After the robbers left the office Mr. Ray called the Police Department and two uniformed officers soon responded to the call. Shortly thereafter a technician from the fingerprint division arrived but no latent fingerprints were lifted. Mr. Ray stated the robbers did not touch anything in removing the money from the drawer.
Mr. Ray made a positive in-court identification of appellant as the robber who held the pistol at his head in a well lighted place without a disguise of any kind during the robbery. He stated that he next saw appellant about a week later in the county jail.
On cross-examination Mr. Ray did not waver in his identification of appellant as the gunman. He estimated that appellant was about five feet eight inches tall and weighed between 140 and 150 pounds. He denied testifying at the preliminary hearing that the gunman weighed 160 pounds. He admitted stating at the preliminary trial that the gunman had dark eyes, "like all colored people."
Sergeant Paul Hurst stated he is a robbery investigator with the Birmingham Police Department and was assigned to investigate this robbery. He first contacted Mr. Ray on October 16, 1978. His next contacts with Mr. Ray were on November 2 and November 8, 1978. Officer Hurst testified that he did not have a report, or any reports or records relative to any investigation by an evidence technician. He was about to testify that later he and Mr. Ray went to the county jail but the trial judge interrupted him and stated he could not go into what transpired at the county jail at this time.
Thereupon the State rested subject to recalling Sergeant Hurst. At this point appellant moved to exclude the State's evidence and asked for a directed verdict of not guilty. The motion was overruled and the defense proceeded with its case.
Mr. Robert A. Jones, Jr., an attorney, was called as a witness for the defense. He represented appellant at the preliminary hearing at which time he questioned Mr. Ray. He stated Mr. Ray testified at this hearing that the gunman's eyes were dark like all colored people's and that the gunman weighed about 160 pounds. He said appellant's eyes were "sort of lightish green in color, greenish brown, with a light colored greenish."
On cross-examination Mr. Jones was asked to leave the witness stand and describe appellant's eyes from a closer vantage point. Mr. Jones left the stand and got a closer look at appellant's eyes and said his eyes were greenish brown in color.
Appellant testified in his own behalf and stated he lives with his mother at 2702 Twentieth Avenue, North. He said he was at home on the evening of October 13, 1978. *Page 1227 
He denied going to the Hendon Parking Company's office or the adjacent car lot. He also denied participating in the robbery of Mr. Albert Ray.
On cross-examination appellant stated that he was at home with his mother all day on October 13, 1978. He said he was not ill that day and no one other than his mother saw him at home on that day. He was unable to give his height but stated he weighed 120 pounds. He further testified that he did not know where he was on October 14, or 15, 1978, but that on October 28 he was sure he was in the county jail.
On rebuttal the State recalled the robbery victim who testified that Sergeant Hurst showed him four or five photographs at their first meeting at the City Hall and asked him if he recognized anyone in those photographs and he stated:
 "I told Sergeant Hurst that the man looked familiar but I wasn't going to identify him by the picture, that I wanted to see him in a lineup."
Mr. Ray further stated that he now knew that it was Anthony Williamson's photograph that looked familiar.
Four or five days after viewing the photographs Mr. Ray attended a lineup of five black males and without the slightest hesitation he identified appellant as the robber who held the pistol at his head during the robbery. He denied that the police officer directed his attention to the photograph of appellant in any manner and stated that he did not look at the background of the photographs. He was looking at the faces and trying to identify the face.
Sergeant Hurst testified on recall that he showed Mr. Ray five photographs on November 2, 1978, at the City Hall and told him:
 ". . . that I had five photographs that I wanted him to look at, that the person that robbed him may, or may not, be in there, but I wanted him to look and if he was, I wanted him to throw the picture aside."
Sergeant Hurst was requested to produce the five photographs which were shown the robbery victim and they were produced and marked as State's Exhibits A, B, C, D, and E for identification. The defense requested that they be permitted to voir dire Sergeant Hurst out of the presence of the jury and the request was granted.
On voir dire Sergeant Hurst testified that when he showed the robbery victim the five photographs he did not have any particular suspect in mind and that he did not have any particular reason for including appellant's photograph in the photographic array as he was not a suspect at that time.
Appellant moved to exclude all the photographs from the evidence on the ground that the complexions of the individuals, other than appellant's, were either lighter or darker than appellant's complexion and this tended to single out appellant. He also contended that certain marks in the background of the photographs constituted a height chart which also tended to single out appellant. This motion was overruled.
Sergeant Hurst further testified that appellant was the only individual to appear in both the photographic array and the lineup. The lineup was composed of six individuals. At the time of the lineup appellant was not a suspect and had not been charged with this robbery and was not represented by counsel at the lineup. He admitted that he knew appellant was fifteen years of age at the time of the lineup.
While still on voir dire Sergeant Hurst stated that he conducted the lineup but did not know who arranged the details of it. He said he called the county jail and spoke to a Sergeant and requested that a lineup be arranged. When he and the robbery victim arrived to view the lineup they viewed the participants through a cardboard screen. Six young black males were placed in the lineup. The names, ages, heights and weights as related by each participant were: Gary Anthony Williamson, 15, 5 feet 6 inches, and 100 pounds; Vincent Woodard, 14, 6 feet, and 154 pounds; Lorenzo Miller, 14, 5 feet 6 inches, and 133 pounds; William Lathen, 16, 5 feet 7 inches, and 130 pounds; Theodus Emerson, 15, 5 feet 6 inches, and 100 pounds; and Donald *Page 1228 
Williams, 19, 5 feet 5 inches, and 110 pounds. Appellant's skin is medium brown in color and the others were various shades of brown and black. The lineup participants stood in the hallway about 10 or 15 feet from Sergeant Hurst and Mr. Ray. There was no special lighting in the hallway. No height charts were placed behind those in the lineup and each person was bareheaded. Each was dressed in blue jeans and denim shirts.
Sergeant Hurst said to Mr. Ray prior to the lineup:
 ". . . that the person that robbed him, may or may not be in the lineup, that I wanted him to take a good look and take his time, and if he saw the guy in there to tell me where he was standing which he did."
After viewing the lineup Mr. Ray pointed to appellant and said, "That's him, right there . . . the first one on this end," pointing to the one on the left end of the line.
At the conclusion of the voir dire appellant moved to exclude all evidence concerning the lineup on the ground that appellant was a juvenile without counsel or a friendly adult; and that appellant was not told that he was going to be placed in a lineup; was not told of the charge against him or that a charge might result therefrom; that he was denied counsel; and was the only person to appear in the photographic array and the lineup. The trial court denied the motion and found nothing was suggestive about the procedures used by the police. The court noted that two days prior to the lineup Judge Bell of the Family Court had ordered appellant transferred to the county jail on another charge, "on the basis of incorrigibility."
On rebuttal the State introduced into evidence Exhibits A, B, C, D, and E, which were photographs viewed by Mr. Ray on November 2, 1978. Sergeant Hurst testified that before showing these photographs to Mr. Ray he told him the person who robbed him may or may not be in this array but if he recognized the robber to put that photograph to one side. After viewing the five photographs Mr. Ray put Exhibit C to the side — this was the photograph of appellant. However, Mr. Ray wanted to be certain that he had not identified the wrong man and for that reason he requested to view this man in a lineup. At the lineup he picked appellant as the gunman who held the pistol to his head while his companion robbed the place. Mr. Ray also made a positive in-court identification of appellant.
Appellant made four contentions that this case is due to be reversed: (1) The trial court erred in overruling his motion to exclude the State's evidence on the ground of the insufficiency of the evidence to sustain a robbery conviction; (2) that the lineup procedure was so impermissibly suggestive as to create a substantial risk of misidentification; (3) that the introduction into evidence of the photographic display was error; and (4) the absence of counsel or a friendly adult at the lineup constituted error. We will treat these contentions in the order presented.
Contention 1. Appellant argues, in brief, that there was no evidence of the commission of a robbery, or if one was committed there is no evidence to implicate appellant except the testimony of the victim.
In Godbee v. State, 56 Ala. App. 174, 320 So.2d 107, this court held:
 "The State made out a prima facie case with the testimony of the robbery victim. We have repeatedly held that in our system of criminal justice we do not travel on the numerical number of witnesses. A fact may be established as firmly by the testimony of one witness as by the testimony of an entire community."
In Arnold v. State, Ala.Cr.App., 348 So.2d 1092, this court held that the testimony of the victim alone was sufficient to establish a prima facie case of robbery.
Contention 2. The United States Supreme Court rejected a per se exclusionary rule and adopted a rule whereby identification evidence gained by suggestive identification procedures would be admitted if under the totality of the circumstances there *Page 1229 
did not exist a substantial likelihood of irreparable misidentification. Manson v. Brathwaite, 432 U.S. 98,97 S.Ct. 2243, 53 L.Ed.2d 140. In this case the court said:
 ". . . that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-Stovall [v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199] confrontations. The factors to be considered are set out in Biggers. 409 U.S., at 199-200, 93 S.Ct., at 382. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself."
The prerequisite for the application of the factors spelled out in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375,34 L.Ed.2d 401, is that suggestive procedures were used in obtaining out-of-court identification. The trial court below heard testimony on voir dire outside the presence of the jury concerning all aspects of the photographic array and the subsequent lineup. The court concluded that the procedures followed were not suggestive. A close scrutiny of the State's Exhibits A, B, C, D, and E and of the testimony lead fairly to the conclusion that the procedures were not suggestive. There is absolutely no evidence of prompting the witness or use of any procedures which might tend to focus attention on the defendant.
An application of the factors enunciated in Biggers further demonstrates the lack of opportunity for a substantial risk of misidentification.
1. The opportunity of the victim to view the assailant at the time of the crime. The victim viewed the robber, who was holding a pistol within a foot of the victim's head, in a well lighted room, for ten to twenty seconds. Neither assailant wore a mask or face covering.
2. The victim's degree of attention. The victim was able to describe the gun in detail and described the gunman as being about 5'9" tall and weighing 140 to 150 pounds.
3. The accuracy of the victim's prior description. The record does not disclose any description of the gunman before the preliminary hearing. The victim remembered testifying at the preliminary hearing that the gunman had dark eyes, "like all colored people." He denied testifying that the gunman weighed 160 pounds.
4. The level of certainty demonstrated by the witness at the confrontation. When Mr. Ray viewed the photographic array he indicated that the defendant was his assailant but he wished to reserve judgment until he could see him in person. Upon the holding of the lineup Mr. Ray positively identified the defendant as his assailant.
5. The length of time between the confrontation and the crime. The robbery occurred on October 13, 1978. On November 2, 1978, Mr. Ray viewed the photographic array and indicated a tentative identification of the defendant. On November 8, 1978, Mr. Ray viewed the lineup and positively identified the defendant as his assailant.
Reliability is the linchpin upon which the question of suggestiveness creating a substantial danger of misidentification turns. Weaver v. State, Ala.Cr.App.,350 So.2d 734. The procedures followed in this instance were not suggestive and the identification was reliable. See Williams v.State, 51 Ala. App. 1, 282 So.2d 349, cert. denied, 291 Ala. 803, 282 So.2d 355 (1973); Hood v. State, 47 Ala. App. 192,252 So.2d 117; Quinn v. State, Ala.Cr.App., 337 So.2d 162.
The defendant did not object when Mr. Ray testified on rebuttal about the photographic array and the lineup, but only upon the introduction of the photographic array through the testimony of Sergeant Hurst. There is no error in the ruling of the trial court in admitting the State's Exhibits A through E. *Page 1230 
Contention 3. The defendant questions whether the introduction into evidence of the photographic display constituted reversible error.
The defendant relies on Holsclaw v. State, Ala.Cr.App.,364 So.2d 378, in which this court held that it was reversible error to introduce mug shots that depicted the defendant in such a manner that the jury could reasonably infer that he had a prior criminal record, where the manner of introduction drew particular attention to the mug shots, and where the State did not have a demonstrable need to introduce the mug shots in light of reliable in-court identifications. The defendant inHolsclaw was convicted of assault with intent to ravish. The State presented testimony from the victim and a witness in the form of in-court identifications made particularly reliable by the circumstances involved.
At trial the State introduced twelve police photographs of six people used by the arresting officer in obtaining an identification of Holsclaw from the victim and the witness. Holsclaw was depicted by two of the photographs in the standard profile and frontal views used in mug shots. Hanging from his neck was a placard bearing:
 "Police Department Huntsville, Alabama 1-13-75 056567"
These photographs were admitted over the defendant's objection.
On appeal, this court followed the analysis adopted by the United States Court of Appeals for the Fifth Circuit in UnitedStates v. Bowers, 567 F.2d 1309 (5th Cir. 1978) which was originally set forth in United States v. Harrington,490 F.2d 487 (2nd Cir. 1973). In Harrington the court held that it is reversible error to admit "mug shot" type photographs unless:
 "1. The Government must have a demonstrable need to introduce the photographs; and
 "2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and
 "3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs."
The court in Harrington balanced these elements and the scales of justice tilted against the State. Although the State had a demonstrable need to introduce the photographs, this factor was greatly outweighed by the others.
The photographs in Harrington were juxtaposed full face and profile photographic displays normally associated with "mug shots." The court said:
 ". . . it is helpful to recall Judge Leventhal's discussion in Barnes [v. United States, 365 F.2d 509
(D.C. Cir.)] that the `double shot' picture produces a `natural, perhaps automatic' inference of prior encounters with the police and that crude and inartful masking of these pictures heightens, rather than diminishes, their significance to the jury. 365 F.2d at 510-511. The photographs herein were `masked' but in a grossly incompetent fashion. Without basing our resolution of appellant's `mug shot' contention on the second element of the test we propose, we think that the preferable course of action when mug shots are to be introduced would be to produce photographic duplicates of the mug shots. These copies would lack any incriminating indicia — i.e., inscriptions of identification numbers, and they would also avoid use of the juxtaposed full face and profile photographic display normally associated with `mug shots.'" 490 F.2d at 495.
In Harrington the entire debate over the propriety and admissibility of the photographs took place in the presence of the jury thereby drawing particular attention to the source or implications of the photographs.
The court noted that Harrington did not take the stand saying:
 "Of course, as we have pointed out earlier, if the defendant should take the stand or be responsible, without proper reason, for placing his prior record before the *Page 1231 
jury, then different rules would apply. Harrington did not testify on his own behalf. Nor was he responsible for the jury's acquiring its knowledge of his previous conviction." Footnote 3, 490 F.2d at 495.
In Holsclaw, the defendant also did not take the stand in his own behalf. The court stated, ". . . the defendant not having taken the stand and having been identified positively in court by two witnesses, did not place his identity in issue."
In the instant case appellant did take the stand and his identity was placed in issue. Furthermore, the in-court identification was not as strong as in Holsclaw where the witness had known the defendant for some time before the crime and the victim had examined Holsclaw's driver's license prior to the crime. Clearly the State in the instant case had a demonstrable need to introduce the photographs. We note that this is not a "mug shot" case.
The photograph presently before the court is vastly different from those in Holsclaw and Harrington. In each of those cases the courts were considering the effects of "mug shots" consisting of juxtaposed frontal and profile views of the defendant complete with police identification numbers and name of police department. The particular photograph of the instant appellant consists of merely a frontal view of the defendant standing before a height chart. This rather innocuous photograph is devoid of markings which imply past criminal behavior.
One cannot fairly say that the photograph in question was introduced in such a manner as to draw attention to its source or implications. The appellant examined the State's witness, Sergeant Hurst, on voir dire outside the presence of the jury prior to the court's admission of the photographs avoiding the highly prejudicial circumstances found in Harrington.
In sum, the introduction of the photograph of the appellant did not prejudice his right to a fair trial.
Contention 4. Appellant questions whether the absence of counsel or of a friendly adult at the lineup in which a juvenile was made to participate taints the lineup to such an extent that it was reversible error to admit this evidence.
Appellant alleges that the State did not satisfy its burden of establishing a basis for the in-court identification of the appellant independent of the lineup which was fatally tainted by the absence of counsel. He relies on Robinson v. State,45 Ala. App. 236, 228 So.2d 850 (1969); Davis v. State, 49 Ala. App. 587, 274 So.2d 360, cert. denied, 290 Ala. 364, 274 So.2d 363
(1972); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926,18 L.Ed.2d 1149 and In re Gault, 387 U.S. 1, 87 S.Ct. 1428,18 L.Ed.2d 527 (1967).
Appellant had been adjudicated "incorrigible" on the basis of another charge pending below and transferred from juvenile court to the Circuit Court to be tried as an adult two days prior to the lineup. § 12-15-34, Code of Alabama, 1975.
The defendant was placed in a lineup on November 8, 1978 before he was indicted on February 9, 1979. There is no right to counsel at a pre-indictment lineup. Kirby v. Illinois,406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), Mullins v.State, Ala.Cr.App., 344 So.2d 539, and the evidence of the lineup was not rendered illegal by the absence of counsel.
Appellant received a fair trial and that is all he was due. There is no error in the record and the judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur. *Page 1232